MELINDA HAAG (CABN 132612)
United States Attorney

MIRANDA KANE (CABN 150630)
Chief, Criminal Division

STEPHEN MEYER (CABN 263954)
Assistant United States Attorney

   150 Almaden Boulevard, Suite 900
San Jose, CA 95113
Telephone: (408) 535-5032
Fax: (408)-535-5066
E-Mail: Stephen.Meyer@usdoj.gov

Attorneys for the United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No. CR-12-0407 CW |
| | ) | |
| | ) | UNITED STATES' SENTENCING |
| | ) | MEMORANDUM |
| v. | ) | |
| | ) | **Sentencing Date: March 11, 2013,** |
| JARVIS TOUSSAINT, | ) | **2:00 p.m.** |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| | ) | |

The United States of America respectfully requests that defendant Jarvis Toussaint be sentenced to 120 months imprisonment, near the top of the United States Sentencing Guidelines ("Guidelines") range applicable to his case, and five years of supervised release. The defendant pleaded guilty pursuant to Rule 11(c)(1)(A), (B) of the Federal Rules of Criminal Procedure without any agreement as to the Guidelines calculation. As set forth in detail below, the government's calculation of the Total Offense Level is 20 and the defendant is in Criminal History Category IV, which corresponds to a Guidelines range of 51 to 63 months, plus a consecutive term of 60 months for Count III. The United States Probation Office ("Probation") recommends a prison term at the bottom of the Guidelines range. For the reasons that follow, the

UNITED STATES' SENTENCING MEMORANDUM - Toussaint
No. CR-12-0407 CW                                    -1-

government believe that a sentence of 120 months is the minimum necessary to meet the goals of sentencing.

## I.    Offense Conduct

The government relies on the description of the offense set forth in the Presentence Investigation Report ("PSR"), and therefore only presents the offense conduct here in summary fashion. It should be noted that all events described below were audio and video recorded by law enforcement.

### A.    Toussaint's Involvement in Gun and Drug Sales

On April 27, 2012, Toussaint attempted to sell an undercover ATF agent (the "UC") a .45 caliber pistol for $700. While the UC and Toussaint waited for Toussaint's connection to deliver the gun, Toussaint showed the UC some heroin, which he advised he acquires for $1,200 an ounce and sells for $100 per gram. The firearm was not delivered before the UC advised Toussaint that he had to leave. (PSR ¶ 7).

On April 30, 2012, the UC purchased a shotgun from co-defendant Gilbert Perez for $500, which was brokered through Toussaint and co-defendant Oscar Vilanova. While waiting for Perez to bring the shotgun, Toussaint advised the UC that he had another associate looking to sell an SKS rifle for $350. Toussaint showed the UC a photograph of the SKS rifle that was stored on his cell phone and advised the UC that the rifle could be delivered later that day or the next day by Toussaint for an additional $50 finder's fee. The UC agreed to buy the SKS rifle and also asked about purchasing some heroin. Toussaint told the UC that his cousin would sell him an ounce of heroin for $1,000 and showed him a sample that he removed from his pocket. (PSR ¶¶ 8-9).

On May 1, 2012, Toussaint and Vilanova met with the UC and delivered the SKS rifle. The UC paid Toussaint $400 for the rifle. Toussaint stated that he would acquire additional firearms to sell to the UC. (PSR ¶ 11).

On May 2, 2012, Toussaint met with the UC to broker a sale of two ounces of heroin from his cousin to the UC (PSR ¶ 12). They were unable to locate Toussaint's cousin, but Toussaint once again showed the UC a sample of heroin from his pocket. (PSR ¶ 15).

UNITED STATES' SENTENCING MEMORANDUM - Toussaint
No. CR-12-0407 CW                    -2-

B.    The Robbery Conspiracy Planning

During the May 2 meeting, the UC mentioned that he was a drug courier for a Mexican drug trafficking organization, and that he frequently transports five kilograms of cocaine from Oakland to Los Angeles.  The UC complained about the low compensation he was receiving and the UC and Toussaint began to discuss a plan to rob the drug trafficking organization's  stash house.  The UC explained that the drug organization got shipments every two weeks, and although he only picked up five kilograms of cocaine from the stash house on each of his prior trips, there was always at least 15 kilograms of cocaine in addition to the five he picked up.  The UC also warned Toussaint that the drug stash house was guarded by two to three armed men. Toussaint advised that he would recruit his cousins, including Carr, to help Toussaint commit the robbery.  When the UC questioned the abilities of Toussaint's cousins for a robbery like this one, Toussaint vouched for them and said that he had "got down with each and every one of them." Toussaint also stated that he and one of his cousins each had a firearm, but he was not sure if Carr had a firearm.  Toussaint also discussed his plan to distribute his share of the cocaine that they would be robbing.  (PSR ¶¶ 13-15).

Later on May 2, the UC and Toussaint met with Carr and advised him of the opportunity to rob a drug stash house.  Carr was given the same facts about the target stash house including the amount of drugs and the armed guards.  Toussaint asked Carr what would happen if someone tried to rob him of that much cocaine.  Recognizing the gravity of what they were planning, Carr stated that the drug traffickers would "have to die."  Toussaint and Carr also recognized the dangers associated with distributing the cocaine stolen from the Mexican drug trafficking organization, or as they called it "the cartel," and talked about steps they would take to conceal the origin of the drugs when they resold it, including repackaging it and selling it in smaller quantities. (PSR ¶ 16).

On May 3, the UC and Toussaint met with two undercover ATF agents posing as members of the drug trafficking organization with which the UC purportedly worked.  Toussaint and the UC further discussed the plan to rob the drug stash house, including the fact that Toussaint had an AK-47 assault rifle they could use for the robbery.  At one point, Toussaint

UNITED STATES' SENTENCING MEMORANDUM - Toussaint
No. CR-12-0407 CW                              -3-

confided in the UC that he had previously participated in two shootings, including one where Toussaint killed someone in retaliation for his cousin being shot on a separate occasion. Toussaint also reconfirmed his willingness and abilty to do the robbery based on his and his cohorts prior experience. (PSR ¶ 17).

On May 7, the UC met with Toussaint and Carr and they confirmed that they still wanted to commit the robbery of the drug stash house. Toussaint and Carr advised that they had several handguns they would bring and a machine gun, which they referred to as a "chopper." (PSR ¶ 18).

C.    Preparations on the Day of the Planned Robbery

On the day of the planned robbery, the UC picked up Toussaint at a BART station in Oakland at approximately 10:49 am. Toussaint proceeded to direct the UC to two locations where Toussaint attempted to acquire a firearm. He was eventually successful in meeting up with an individual who delivered a loaded Glock, .40 caliber, semi-automatic pistol. At 11:30 am, Carr joined up with Toussaint and the UC, and they drove around to various locations to attempt to acquire a firearm to be used by Carr. During this time, they also discussed how Toussaint and Carr would carry out the robbery after the UC made his drug pick up that day. At approximately 12:30 pm, co-defendant Delvon Smith delivered a loaded Beretta pistol at Toussaint's request. Initially Smith attempted to hand the gun to Toussaint, but Toussaint directed him to give it to Carr, which he did in the back seat of the UC's vehicle. (PSR ¶¶ 119-21).

At 12:45 pm, co-defendant Lance Green joined Carr in the back seat of the UC vehicle at the request of Toussaint who was in the front passenger seat and the UC was in the driver's seat. Green arrived because Toussaint called and told him that he had an emergency and needed him to bring his "ham sandwich," referring to a gun. Once inside the car, Toussaint advised Green that he was inviting him in on a "million dollar lick." A "lick" is a common term used to refer to a robbery. The UC also told Green that there would be plenty of cocaine for everyone, and asked Green if he was "with it." Green responded affirmatively and they all proceeded to the location where a minivan was staged that was supposed to be used for the robbery. After the UC

UNITED STATES' SENTENCING MEMORANDUM - Toussaint
No. CR-12-0407 CW                    -4-

parked his vehicle near the minivan, Toussaint, Carr and Green exited the UC's vehicle and approached the minivan to be used in the robbery. At that point, ATF agents moved in to make the arrests and the defendants all scrambled into the minivan. Three firearms were recovered from the minivan during the arrest of the defendants: the Glock delivered to Toussaint, which was loaded with 11 bullets, the Berettta delivered to Carr, which was loaded with 9 bullets, and a Sig Sauer, 9 mm pistol, loaded with 21 bullets, which Green had brought with him. All three firearms were previously stolen. (PSR ¶¶ 21-23).

## II. Guidelines Calculation

The parties could not reach agreement as to the calculation of the Guidelines because the government calculates the Guidelines to include: (1) a one-point enhancement, pursuant to § 2B3.1(b)(6), because taking a controlled substance was an object of the offense; and (2) a two-point enhancement, pursuant to § 2B3.1(b)(7)(C), because the intended loss was more than $50,000. With a Base Offense Level of 20, plus the two enhancements described above, the Adjusted Offense Level is 23. It should be noted that an enhancement under § 2B3.1(b)(2)(C) (possession of firearm) was not applied because the defendant also pled guilty to the 924(c) charge contained in Count Three. Assuming the defendant continues to manifest an acceptance of responsibility, there is a three-point reduction for acceptance of responsibility, pursuant to § 3E1.1, and thus the Total Offense Level is 20. The defendant has a Criminal History Category IV, which corresponds to a Guidelines range of 51 to 63 months, plus a consecutive term of 60 months for Count III.

In a more recent objection to the Guidelines calculation, defendant Carr claims that a three-point reduction should be applied, pursuant to § 2X1.1(b)(2), because the offense was a conspiracy. Below, the government explains why each of its disputed enhancements is applicable, and why defendant Carr's requested reduction is not applicable.

A.      The Disputed Guideline Enhancements

Guideline § 2X1.1, which governs conspiracies and attempts not specifically covered by another offense guideline section, states that the offense level is to be determined by using the "base offense level from the guideline for the substantive offense, plus any adjustments from

UNITED STATES' SENTENCING MEMORANDUM - Toussaint
No. CR-12-0407 CW                              -5-

such guideline for any intended offense conduct that can be established with reasonable certainty." U.S.S.G § 2X1.1(a). The Application Notes make clear that what must be reasonably certain is the intent to commit the conduct that triggers the enhancement. Such intent need not have a reasonable certainty of actually occurring. Thus, impossibility is not a defense. Application Note 2 states that "the only specific offense characteristics from the guideline for the substantive offense that apply are those that are determined to have been specifically intended or actually occurred." Application Note 2 provides an example of defendants arrested during the conspiratorial stage of planning an armed bank robbery. In such a situation, the offense level ordinarily would not include aggravating factors regarding possible injury to others, hostage taking, discharge of a weapon or obtaining a large sum of money, because such factors would be speculative. However, "if it was established that the defendants actually intended to physically retrain a teller, the specific offense characteristic for physical restraint would be added." (Emphasis added). Application Note 2 also points out that in an attempted theft, the value of the items that the defendant attempted to steal would be considered.

In this case, the defendants pled guilty to conspiring to commit robbery affecting interstate commerce. However, their relevant conduct also makes them guilty of attempted robbery. The section of the Ninth Circuit Manual of Modern Jury Instructions applicable to Hobbs Act robberies (8.143) describes the element of an "attempt" as requiring that the defendant "did something that was a substantial step toward committing the crime." Here, the defendants took the substantial step of acquiring firearms to be used in the robbery and were about to enter the van to drive to the robbery location when they were apprehended by law enforcement.

1.    A One-Point Enhancement for Taking a Controlled Substance Applies

Here, the applicable guideline section for the substantive offense of robbery is § 2B3.1. Where taking a controlled substance was an object of the offense, there is a one-point enhancement, pursuant to § 2B3.1(b)(6). Here, the defendants conspired to commit an armed robbery of a drug stash house that they were consistently advised had at least 15 to 20 kilograms of cocaine inside. Defendants Toussaint and Carr repeatedly met with the UC and discussed that

UNITED STATES' SENTENCING MEMORANDUM - Toussaint
No. CR-12-0407 CW                    -6-

they would need to repackage the cocaine that they would steal so that it could not be traced back to the robbery.  On the day they planned to commit the robbery they obtained firearms for themselves to use and invited a third person, co-defendant Lance Green, to assist them in the armed robbery.  Thus, there is no doubt that the taking of a controlled substance was the object of the offense.

> 2.     A Two-Point Enhancement for Intended Loss in Excess of $50,000 Applies

Having established that taking a controlled substance was the object of the offense, the value of the controlled substance becomes relevant to determine if an enhancement for "loss" is applicable.  "Loss" is discussed at length in § 2B1.1 of the Guidelines, and it includes intended loss (Application Note 3(A)(ii)).  Application Note 3(F)(vi) to § 2B1.1 also states that in "a case involving controlled substances, loss is the estimated street value of the controlled substances."  Although § 2B1.1 is not the offense guideline section directly applicable to robberies, which is § 2B3.1, the Ninth Circuit has relied on the Application Notes relating to "Loss" contained in § 2B1.1 to robbery offenses where the Guideline calculation was made using § 2B3.1.  For example, in United States v. Napier, 21 F.3d 354, 355 (9th Cir. 1994), the Ninth Circuit utilized the definition of loss found in § 2B1.1 to a bank robbery case where the offense calculation used § 2B3.1 ("'Loss' means the value of the property taken, damaged or destroyed. U.S.S.G. § 2B1.1, comment. (n. 2).")(Internal quotations omitted).  Moreover, the Ninth Circuit has held that when a defendant is apprehended in the process of a robbery, the amount of the loss can mean the potential loss had he not been apprehended.  See United States v. Van Boom, 961 F.2d 145, 146 (9th Cir.1992).  Thus, the value of the controlled substances that were the object of the offense should be included in reaching an accurate Guideline calculation, since the intent to steal 15 to 20 kilograms of cocaine was reasonably certain.

Applying § 2B1.1, Application Notes 3(A)(ii) and 3(F)(vi) to the instant case, the government estimates that an extremely conservative street value for a kilogram of cocaine (sold as a kilogram of cocaine and not broken down into smaller amounts that would increase the value) is at least $15,000.  Thus, the 15 to 20 kilograms of cocaine that were the object of the offense in this case had a conservative value of $225,000 to $300,000.  Giving the defendants the

UNITED STATES' SENTENCING MEMORANDUM - Toussaint
No. CR-12-0407 CW                              -7-

lowest possible value of $225,000 results in a two-point enhancement, pursuant to § 2B3.1(b)(7)(C), because the intended loss was more than $50,000, but less than $250,000.

This result is consistent with Application Note 2 of § 2X1.1.  The government has not sought enhancements for potentially injuries to the gunman who were supposed to be guarding the drug stash house because such injuries would be speculative.  Even though the defendants spoke on multiple occasions about having to kill the guards, that was not an essential part of the plan, and it was possible that they would have carried out the robbery by either restraining the guards or simply disarming them and holding them at gun point.  Thus, the government has not sought the application of enhancements for injuries to victims or restraint of victims.  However, their intent to steal the 15 to 20 kilograms of cocaine that were supposed to be inside the drug stash house was reasonably certain, and the defendants were armed and ready to proceed to the location when they were arrested.  Given these circumstances, there offense conduct included not only conspiring to commit the robbery, but also attempting to do so, since they had taken the substantial step of acquiring firearms and meeting up as a team to proceed to the robbery location.  As such, the last sentence of Application Note 2 to § 2X1.1 requires that the value of the items that the defendant attempted to steal be used in calculating the offense level.

B.      The Three-Point Reduction Under §2X1.1(b)(2)  is Inapplicable

In a recent letter to Probation, Defendant Carr submitted an additional objection to the PSR's calculation of the Guideline in which he seeks a three-point reduction, pursuant to §2X1.1(b)(2), because the offense was a conspiracy.  Although defendant Toussaint has not joined in this objection, the government addresses it here because it would be applicable to both defendants if applied.

Defendant Carr relies on United States v. Martinez-Martinez, 156 F.3d 936 (9th Cir. 1998) and argues that the three-point reduction applies because the conspirators in the instant case had not completed all the acts necessary for the completion of the substantive offense.  The government's position is that the three-point reduction does not apply because of the second prong of the exclusion applicable to conspiracies: "the circumstances demonstrate that the conspirators were about to complete all [acts the conspirators believed necessary on their part for

the successful completion of the substantive offense] but for apprehension or interruption by some similar event beyond their control." U.S.S.G. §2X1.1(b)(2). Here, unlike in Martinez-Martinez, the conspirators had agreed to commit the robbery, had acquired firearms to go do the robbery and were getting into a van to drive to the stash house location and commit the robbery when they were interrupted by law enforcement. In Martinez-Martinez, the conspirators had abandoned their planned theft on prior occasions when the containers they broke into did not contain goods that they thought their "boss" would be willing to pay them to steal. On the occasion when they were arrested, the conspirators had not yet checked with the "boss" to see if the materials that were inside the container they had just opened were of the type the "boss" would be willing to pay them for stealing. If the good were not acceptable to the "boss," the conspirators would not have stolen the goods. Thus, the theft was still pending a decision by the "boss" that made the substantive offense neither complete, nor about to be complete.

In the instant case, there was no precondition to the impending robbery and no further agreements had to be made before they could proceed with the robbery. Thus, this case is more in line with United States v. Panaro, 75 Fed. Appx.590 (9th Cir. 2003) in which the reduction was not applied where the conspirators agreed to extort a target, but also agreed to delay the extortion until after one of the conspirators had an opportunity to burglarize the victim's home, and the victim was killed in the course of that burglary. There, the Court reasoned that Martinez-Martinez "does not call for a different conclusion, because in that case the planned theft had not been authorized by the conspirators' boss – an agreed-upon precondition to their proceeding with the theft. Here, by contrast, no precondition existed – no further decisions were necessary before the extortion was to be carried out." Panaro, 75 Fed. Appx. at 592.

Not reducing the Guidelines calculation is also consistent with the Background commentary for §2X1.1:

> In most prosecutions for conspiracies or attempts, the substantive offense was substantially completed or interrupted or prevented on the verge of completion by the intercession of law enforcement authorities or the victim. In such cases, no reduction of the offense level is warranted. Sometimes, however, the arrest occurs well before the defendant or any co-conspirator has completed the acts

UNITED STATES' SENTENCING MEMORANDUM - Toussaint
No. CR-12-0407 CW                                        -9-

necessary for the substantive offense.  Under such circumstances, a reduction of 3 levels is provided under §2X1.1(b)(1) or (2).

It also reasonably differentiates between individuals who are at a stage in the conspiracy where they are simply planning their crimes, from individuals who have taken a significant step to place their plan into action.  Under defendant Carr's logic, the defendant who breaks into a house to commit a robbery would be entitled to a three-point reduction if the house is empty, because he would have nobody to rob.  The Guidelines cannot intend such a result.

**III.    The Other 3553(a) Factors**

While the Guidelines adequately address many of the other 3553(a) factors, there are aspects of the offense conduct and the history and characteristics of the defendant that are not accounted for in the Guidelines, and thus the government addresses those here.

A.    Nature and Circumstances of the Offense

There are a number of aggravating factors about Toussaint's involvement in the offense that are not taken into account by the Guidelines, and form part of the basis for the government's request for a sentence near the top of the Guidelines.

First, the fact that Toussaint was trafficking firearms and heroin is not taken into account by the Guidelines.  Toussaint was involved in selling three firearms to the UC on three separate occasions.  At the time, Toussaint believed the UC was a drug dealer, which makes his sale of the firearms that much more dangerous.  Furthermore, one of the firearms that Toussaint sold was an SKS rifle.  In addition, Toussaint advised the UC that he could sell him even more guns.  At the same time that Toussaint was trafficking the firearms to the UC, he was also trafficking in heroin.  He displayed heroin to the UC on three separate occasions, and advised the UC that he gets the heroin for between $1,000 to $1,200 per ounce, and sells it at $100 per gram.  On a separate occasion, he advised the UC that his cousin would sell the UC an ounce of heroin for $1,000.  Toussaint even took the UC to his cousin to consummate a sale of two ounces of heroin, but could not locate his cousin on the day of the deal.  Toussaint did, however, once again show the UC a sample of heroin he had on his person.  Toussaint's involvement in selling drugs was also underscored by his statements to the UC that cocaine was hard to acquire recently and that

UNITED STATES' SENTENCING MEMORANDUM - Toussaint
No. CR-12-0407 CW                                -10-

he knew of specific individuals to whom he could quickly sell the kilograms of cocaine that they were about to rob.

With respect to planning the robbery and bringing the plan into action, Toussaint played the most active role. However, because his activities did not qualify for a leadership role under the Guidelines, his role in the offense was not fully addressed by the Guidelines calculation. Toussaint was the defendant who most often met with the UC to discuss the planned robbery. They first discussed it on May 2 without Carr, and then met with Carr later that day to discuss it again. From May 2 through May 10, Toussaint had no less than 8 separate discussions with the UC about the logistics of the robbery.[1]  The government has no way of knowing how many additional planning discussions Toussaint had with others, but he did advise the UC that he was recruiting other individuals who would participate with him and Carr on the robbery. At various points in the planning, he discussed bringing in as many as five other individuals, but in the end he only recruited Carr and Green. On the day of the robbery, Toussaint also acquired the loaded firearms that were to be used in the robbery. He not only acquired the gun he was going to use himself, but also acquired a gun for Carr. When co-defendant Delvon Smith delivered the gun to the UC's car at Toussaint's request, he initially tried to hand it to Toussaint, but Toussaint directed him to give the gun to Carr. He also previously advised the UC that he had access to a "chopper" and an AK-47 assault rifle that could be used in the robbery, but had not picked up those guns at the time he was arrested. Based on the guns he sold the UC and acquired for the robbery, Toussaint had an established network of gun suppliers.

Finally, Toussaint's willingness to kill his victims, and his statements to the UC that he had killed before, are also not accounted for in the Guidelines calculation. From the first day that Toussaint, Carr and the UC discussed robbing a drug stash house operated by a Mexican

---

[1]  On May 2, he discussed it with the UC and then they met with Carr and discussed it again extensively. On May 3, Toussaint and the UC discussed the robbery plan on their way to meet the drug supplier and again after the meeting when they were trying to find Toussaint's cousin to buy two ounces of heroin. On May 4, Toussaint and the UC discussed the plan briefly by phone. On May 7, Toussaint and Carr met with the UC and discussed the robbery plan at length. On May 9, Toussaint and the UC again discussed the plan by phone. On May 10, on the day of the robbery, Toussaint and Carr ran through the robbery plan with the UC.

UNITED STATES' SENTENCING MEMORANDUM - Toussaint
No. CR-12-0407 CW                              -11-

drug cartel, Toussaint and Carr recognized the dangerousness of their plan.  Carr remarked that the armed guards at the stash house would all have to be killed.  A day later, when Carr was not present, Toussaint advised the UC that he had been involved in two prior shootings, including one in which he killed someone in revenge for that person shooting his cousin on a prior occasion.  Toussaint also repeatedly vouched for those he was going to bring in to participate in the robbery by telling the UC that he had "gotten down" with each of them.  The government believes this was a reference to having previously committed violent crimes with these individuals.  Despite having over a week to think about the contemplated robbery, and explicitly stating that the robbery would likely result in a shoot out and the killing of the armed guards at the stash house, Toussaint and Carr never backed out of the robbery plan.

In the governments view, these facts about the offense conduct warrant a sentence near the top of the applicable Guidelines range for Toussaint.

B.     History and Characteristics of the Defendant

Toussaint's history and characteristics begin with what appears to be a normal upbringing and good family.  Toussaint even maintained steady well-paying employment from 2007 to 2010, but was committing significant crimes during this same time period.    His criminal history did not become very serious until he was 21, when he was first arrested (April 2007) with a gun in his waistband.  He received a misdemeanor conviction for carrying a concealed weapon.  Approximately four months later, in August 2007, Toussaint was arrested with Ecstasy pills and again received a misdemeanor conviction for possession of a controlled substance.  Toussaint was with co-defendant Smith at the time of his arrest in 2007.  In February 2009, Toussaint was arrested with another gun, which resulted in his first felony conviction.  The felony conviction did little to deter Toussaint, and in June 2009, he was arrested and later convicted of Possess/Sell Switch Blade Knife, which was a misdemeanor conviction.  Toussaint's last conviction before the instant offense came in June 2011 (stemming from an arrest in December 2010), when he was convicted of Possess Controlled Substance While Armed, a felony.  Toussaint's continued possession of firearms and drugs after his arrests and convictions for the same conduct is

troublesome. Not including the guns he possessed and sold in the instant case, the defendant has been arrested and convicted of possessing firearms on three separate occasions.

In addition, Toussaint admitted to the UC that he had been involved in shootings on two separate occasions. In one of those shootings, Toussaint explained that he killed someone in revenge for that person shooting his cousin on a prior occasion. Toussaint also told the UC that he had prior criminal experience with the people he planned to bring in on the robbery. In Toussaint's words, he had "gotten down" with each of them. This was stated by Toussaint right after the UC questioned whether Toussaint's cohorts could be counted on during this type of robbery.

Finally, all of the firearms that Toussaint and his co-defendants were to use in the robbery were stolen. The gun supplied by Smith to Toussaint was stolen during the course of a violent home invasion robbery of a suspected drug trafficker. The other two guns were separately burglarized from an unoccupied car and house.

Given these history and characteristics of the defendant, the government believes a sentence near the top of the Guidelines range is appropriate.

C.    Respect for the Law, Deterrence and Public Safety

Other 3553(a) factors include the need for the sentence to promote respect for the law, afford adequate deterrence, and protect the public from further criminal conduct by the defendant. 18 U.S.C. § 3553(a).

The government believes that these factors also favor a sentence of 120 months. The fact that the defendant committed the instant offense after three prior convictions for possession of a firearm, and while on probation demonstrates that he is extremely difficult to deter. His willingness to commit a violent armed robbery and kill the armed drug dealers make clear that a lengthy sentence is necessary to protect the public.

Finally, 120 months custody is sufficient, but not greater than necessary, to promote respect for the law considering the defendant's lengthy criminal record of gun possession, the violent nature of the planned robbery, and the plan to distribute kilograms of cocaine onto the streets of Oakland.

## IV.    Conclusion

For the foregoing reasons, the United States respectfully requests that the Court sentence the defendant Jarvis Toussaint to 120 months imprisonment, impose a five-year term of supervised release with the conditions set forth in Probation's recommendation, order defendant to pay a $200 special assessment, and enter a forfeiture judgment consistent with the terms of the plea agreement.

DATED: March 4, 2013

Respectfully submitted,

MELINDA HAAG
United States Attorney

_____/s/_____
Stephen J. Meyer
Assistant United States Attorney
408-535-5032

UNITED STATES' SENTENCING MEMORANDUM - Toussaint
No. CR-12-0407 CW                    -14-